IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GUARANTEE ELECTRICAL ) <br> CONSTRUCTION COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LVC TECHNOLOGIES, INC., et al., ) <br> ) <br> Defendants. ) | Cause No. 4:05CV-849(JCH) |

## MEMORANDUM AND ORDER

These matters are before the Court on Defendant/Cross-Plaintiff General Motors Corporation's Motion for Summary Judgment on Its Cross-Claim, filed May 19, 2006 (Doc. No. 51), and Defendant/Cross-Plaintiff General Motors Corporation's Motion for Summary Judgment on LVC Technologies, Inc.'s Second Amended Cross-Claim, filed July 10, 2006 (Doc. No. 69). The matters are fully briefed and ready for decision.

## BACKGROUND

In February 2004, General Motors Corporation ("GM") invited unit pricing bids for its North American Manufacturing LAN upgrade project ("NAM project"). This project involved, among other things, the installation of fiber optic cables and infrastructure cabinets at twenty-four[1] GM facilities throughout North America. One of the facilities was the Wentzville Assembly Center ("the Plant"), and construction done there gave rise to this action. LVC Technologies, Inc. ("LVC") was one of the

---

[1] While the pleadings and motions alternate between discussing twenty-two and twenty-four plants, a copy of the invitation to bid shows a list of twenty-four plants. (Statement Material Facts, Doc. No. 71 Ex. F).

1

companies invited to bid on the NAM project and met with GM at a pre-bid meeting on February 17, 2004. During this meeting, LVC claims GM stated that the size of the project at each facility would not exceed 50 copper drops.[2] According to LVC, the NAM project was supposed to be issued as a blanket contract.[3]

The invitation to bid contained several relevant provisions and documents. The opening sheet stated the "successful bidder/contractor shall be responsible to review, understand and comply with the following reference documents ... GM 1638/General Motors/Construction/General Cond."[4] (Statement Facts, Doc. No. 71 Ex. F). In its introduction, the invitation stated that the project would run from the "1st Quarter of 2004 and be successfully completed the 4th Quarter of 2005." (Id.). The introduction also stated that "the unit pricing provided in this bid request will be used for the duration of the project." (Id.). Right below the introduction, a section entitled "GM's Right to Reject Proposals" told bidders that:

> Any exceptions a bidder wishes to take to any of the documents contained in these bid documents, shall be in writing, along with reasons for the exceptions, and shall be submitted along with the bid. If no exceptions are submitted with the bid, the bidder shall be deemed to have accepted all terms and conditions of the proposed contract documents.

(Id.). The invitation to bid also contained a document entitled "Contractor's Letter Of Acceptance Of Terms And Conditions," which GM required a bidder to sign before treating any bid application

---

[2]Throughout the pleadings, LVC has used the number of copper drops as a measure of the scope of the work to be done at the Plant. Additionally, GM has denied that it made this representation. (Ans. Second Am. Cross-cl., Doc. No. 55 ¶ 48).

[3]GM denies that this representation was ever made. (Ans. Second Am. Cross-cl., Doc. No. 55 ¶ 48).

[4]GM has the referenced documents organized in a table, which accounts for the strange citation above.

as complete. (Id. at Ex. G). It stated that:

> This is to advise you that your Terms and Conditions have been examined and all provisions thereof are acceptable; it is understood these Terms and Conditions are to become part of the Contract between the undersigned and General Motors Corporation which incorporates these Terms and Conditions in connection with the Infrastructure Installation Invitation to Bid for NAM Fiber Optic Infrastructure Upgrade.

Finally, the invitation to bid contained a list of the twenty-four sites which were subject to the NAM project. (Id. at Ex. F).

The terms and conditions which the invitation to bid references are found in a document called General Construction Conditions GM 1638 (04/00) ("GM 1638"). This document contains provisions that heavily favor GM.[5] For example, GM 1638 contains an indemnity clause providing that:

> The Contractor shall indemnify, defend with counsel reasonably acceptable to Owner, and hold harmless the Owner from all claims for nonpayment by Subcontractors, Sub-Subcontractors, laborers, vendors, and Materialmen for labor, services or material provided in connection with the Contractor's Work, and shall indemnity, defend and hold the Owner harmless from any construction or mechanics lien, builders trust fund or similar claims filed by Subcontractors, Sub-Subcontractors, laborers, vendors and Materialmen for labor, services or material provided in connection with the Contractor's Work.

(Doc. No. 53 Ex. C at § 3.16.4).

GM 1638 also contains the following relevant provisions for purposes of this action: § 1.3.1 (integration clause)[6]; § 6.4.3 (GM disavows any warranty or representation about the accuracy of

---

[5]It also contains provisions reemphasizing that it is incorporated into the contract. Specifically, it defines "the Contract" to include "(i) ... the Purchase Order issued by the Owner ... [and] (v) this document entitled 'Construction General Conditions.'" (Doc. No. 53 Ex. C at § 1.1). Second, it states that "the Contractor has reviewed and accepted all of the terms and conditions of the Contract documents." (Id. at § 1.2.1(vii)).

[6] It states: "The Contract represents the entire and integrated agreement between the Owner and the Contractor and supersedes all prior negotiations, representations, or agreements, whether written or oral. The Contract may only be amended or modified only by a written amendment to the

3

drawings and specifications)[7]; § 7.1.1(period of time is that in contract, including authorized changes by GM)[8]; § 7.3.9 (assigning jurisdiction for work stoppages and labor disputes to contractor)[9]; § 7.4.3 (outlining procedures required when GM causes a delay and that failure to follow these procedures results in waiver of claims against GM)[10]; § 8.8.2 (allowing GM to keep retention payment until all contractor's duties, including payment of subcontractors, under the contract are fulfilled)[11]; § 13.1.1 (allowing GM to change the scope of the work without rendering the contract void)[12]; § 13.2.10

---

Contract signed by both parties, or a Purchase Order Alteration."

[7]This provision states:
The Contractor acknowledges that ... changes are anticipated to the scope of the Work ... the Contractor acknowledges that the Owner makes no representation or warranty, express or implied, that the Drawings and Specifications are complete or accurate. The Contractor agrees that the Contractor's sole remedy for inaccuracies or omissions in the Drawings or Specifications or other changes in the anticipated project conditions are those remedies provided under the Contract Documents.

[8]It states: "Unless otherwise provided, the Contract Time is the period of time allotted in the Contract Documents for Final Completion of the Work by the Owner, including authorized adjustments of the original Contract Time."

[9]It provides: "The Contractor will be responsible for the handling of jurisdictional disputes or work stoppages (excluding UAW skilled trade disputes) which may arise during performance of the Work."

[10]It states:
Within four (4) days after the occurrence of a delay caused by the Owner, the Contractor shall notify the Owner in writing, using a DCR form, setting forth in detail the claimed delay, a description of the portions of the Work affected, and additional relevant details. Failure to submit notice of delay required herein shall constitute a waiver of claim by the Contractor.

[11] In relevant part, it states: "The Retention Payment shall not become due until the Contractor has fulfilled all requirements under the Contract including full payment of all Subcontractors..."

[12]This provisions states: "The Owner shall have the right at any time to require alterations in, additions to and deductions from the Work without rendering void the Contract. Unless the Owner agrees otherwise in writing, all changes in the Work shall be completed within the Contract Time set forth in the Contract."

(contractor's failure to submit proper notices for changes in work gives GM the right to determine value of additional, deleted, or changed work)[13]. (Statement Facts, Doc. No. 71 Ex. C).

LVC submitted its bid on February 25, 2004. (Statement Facts, Doc. No. 71 ¶ 4-5). Prior to submitting its bid, LVC did not receive a copy of GM 1638. Its bid, however, did include a signed copy of the "Contractor's Letter Of Acceptance Of Terms And Conditions."[14] (Doc. No. 71 Ex. G). Both sides agree that a bid made by LVC was accepted; however, neither side has clarified when this acceptance took place or if GM accepted the bid made on February 25, 2004. (Second Am. Cross-cl., Doc. No. 55 ¶ 5; Ans. Second Am. Cross-cl., Doc. No. 60, ¶ 5). Accordingly, both sides also agree that they entered into a contract, but dispute when and on what terms they did so.[15]

Neither side has adequately explained to the Court what happened between February 25, 2004 and June 28, 2004. The Court has pieced together the following. First, it appears that GM did not accept the first bid, but GM and LVC continued negotiations. (Memo. Opp'n, Doc. No. 64). The

---

[13]This provision dictates:
If the Contractor fails to submit a Quotation for additional Work, deleted Work or changed Work.... within the time required for submittal of such Quotation, the Owner shall have the right, after fourteen (14) days prior written notice to the Contractor and failure of the Contractor to submit the required Quotation, to determine the Contract Sum adjustment for such additional, deleted or changed Work and to adjust the Contract Sum and Purchase Order accordingly.

[14]LVC claims that it signed the letter without reviewing GM 1638 because this was "a substantial contract" and it did not want to "lose the opportunity." (Memo. Opp'n, Doc. No. 64). LVC's president Adam Anon signed for the company.

[15]GM made the following allegation in its Cross-Claim: "On or about June 26, 2004, [the parties] entered into a Contract for LVC to perform work at the [Plant]. The Contract was subsequently modified by Alteration No. 1 issued November 8, 2004." (Cross-cl, Doc. No. 17 ¶ 4). LVC answered that "LVC admits it entered into a contract with GM and submits that the documents [referenced in GM's Cross Claim] speak for themselves and are the best evidence thereof...." (Ans. Cross-cl., Doc. 19 ¶ 4).

Court has no information on what happened, if anything, between February 25, 2004 and March 30, 2004. On March 31, 2004 GM sent an email asking for a re-bid on the NAM project, which suggests that the first bid was rejected. (Doc. No. 75 Ex. 3). This email stated that GM had decided that the best way to get the NAM project awarded was to "treat each facility separately" and asked for a re-submission of bids on a "plant by plant basis."[16] (Id.). The Court has not been told what happened, if anything, between April 1, 2004 and May 13, 2004. On May 14, 2004 GM's representative, Arnie Discher, sent an email stating that "it is my intention to be able to award this work as one package."[17] (Response, Doc. No. 73 Ex. F). LVC's President, Adam Anon, claims in an affidavit that he was led to believe that GM was going to award a blanket contract. (Id. at Aff. 1). LVC also claims that on May 25, 2004 it received a snapshot of the work at the Plant that now included 344 copper drops. (Doc. No. 55 ¶ 52).[18]

LVC claims that in "early June, 2004" it was notified that GM had accepted its bid[19], but that GM wanted it to do work at three plants, including the Wentzville Assembly Center, before the entire

---

[16] The Court assumes that LVC rebid because it ultimately performed work for GM at the Plant. The Court does not know how this re-bid was accomplished, i.e. whether the same invitation to bid was resubmitted or whether a new invitation to bid was used.

[17] GM maintains the Court was not given the full scope of this email. It maintains a file entitled "PFCN Bid Template 051404.xls" was attached. (Reply, Doc. No. 74). GM has not explained what that attachment contained. GM additionally has offered the deposition of Richard Shaffer, LVC's Rule 30(b)(6) designee, to rebut the assertion it misrepresented the size of the project. In it, Mr. Shaffer was asked the following question about the bid covering the entire NAM project: "And I think we talked about it, it just says single contractor expected. There was no promise or guarantee made in that, was there not?" Mr. Shaffer responded: "No." (Statement Facts, Doc. No. 71 Ex. K pg. 80-81).

[18] GM disputes this claim, but has not elaborated further. (Doc. No. 60 ¶ 52).

[19] It is not clear whether the parties are referring to the bid of February 25, 2004 or a possible later bid.

6

blanket contract was awarded.[20] (Memo. Opp'n, Doc. No. 64). LVC believed it had 10-12 weeks to complete this job. (Memo. Opp'n, Doc. No. 73 Ex. I). On June 24, 2004 GM sent out a Purchase Order Agreement ("Purchase Order"), which it claims is the contract covering the work at the Plant. The Purchase Order contained a provision stating that GM 1638 "SUPERSEDE[s] THE PRINTED TERMS AND CONDITIONS FOUND ON THE BACK OF THIS PURCHASE ORDER." (Statement Facts, Doc. No. 53 Ex. B). The Purchase Order also contained an additional indemnity provision on the Purchase Order's back side. The Purchase Order also required LVC to sign it and send it back.[21] (Id.). LVC received the document on June 28, 2004; however, it never returned a signed copy to GM. (Memo. Opp'n, Doc. 73 Ex. 1).

LVC claims it refused to sign the Purchase Order because it did not receive a copy of GM 1638. Specifically, LVC claims that from March, 2004 onward, it continually asked GM for a copy of GM 1638 and never received one.[22] LVC has provided the affidavits of LVC employees Adam Anon, Richard Shaffer, and Janie Gertsch stating that despite repeated requests, LVC never got a copy

---

[20]No disputes have arisen over the work done at the other two plants.

[21]Under the signature line it states: "This order is not binding until accepted. Acceptance should be executed on acknowledgment copy which should be returned to buyer." (Doc. No. 53 Ex. B). As mentioned in footnote 5, GM believes the Purchase Order made up the contract. LVC does not.

[22]GM contends that LVC has now changed this position to assert it never received a copy until August, 2004. (Reply to Response, Doc. No. 106).

of GM 1638.[23](Id. at Aff. 1-3)[24].

Despite its refusal to sign the Purchase Order, LVC continued its preparations to begin work at the Plant. LVC claims, in an affidavit by Richard Shaffer, that GM denied it access to the Plant for a walkthrough until June 28, 2004; furthermore, the walkthrough was only one afternoon in length.(Id. at Aff. 2).[25] LVC also claims that the scope of the work to be done at the Plant was again increased at this walkthrough and that the time allotted for it was compressed from 10-12 weeks to 2 weeks. (Second Am. Cross-cl., Doc. No. 55 ¶ 8, 55). LVC claims that because of this drastic increase in size, it was forced to hire Guarantee Electrical Construction Company ("Guarantee") as a subcontractor on a time and materials basis. (Memo. Opp'n, Doc. No. 64). Neither side disputes that LVC and Guarantee performed work at the Plant between July 5 and July 18, 2004. (Doc. No. 71 ¶14). Additionally, neither side disputes that LVC only "substantially completed" the work that needed to be done.[26] (Memo. Opp'n, Doc. No. 73). LVC claims that GM's actions caused it several delays which resulted in it being unable to complete the project. Specifically, GM did not make the plant fully accessible, there was substantial disruption of the work by union personnel, and GM failed to provide

---

[23]GM has offered a competing affidavit, also of an LVC employee, that LVC did receive a copy of GM 1638 in March, 2004 and that it was distributed to LVC employees, including LVC's president. (Supplemental Statement Facts, Doc. No. 68 Ex. 1)

[24]LVC has also provided the affidavit Khaldoun Dabain as further support. (Response to Supplemental Facts, Doc. No. 94 Aff. 2). GM asserts that the testimony of LVC's rule 30(b)(6) designee contradicts these affidavits.

[25]LVC maintains that this delay in access allowed GM to misrepresent the scope of the project. GM claims that no one from LVC asked for access to the Plant before June 28, 2004 and has offered the deposition transcript of LVC's Rule 30(b)(6) designee as proof. (Memo. Support, Doc. No. 70).

[26]Evidently, GM was going to let LVC return and complete the job, but it never happened due to unrelated union labor disputes. (Memo. Opp'n, Doc. No. 72).

sufficient documentation about the placement of fiber locations.[27] (Id. at Aff. 2).

On August 4, 2004 LVC submitted a "project change request" form to GM.[28] (Id. at Ex. I). This form requested that GM pay LVC for the additional labor costs incurred to finish the project in only two weeks. It is not clear if LVC submitted additional forms or asked for additional compensation in other ways. On November 8, 2004, GM issued an Altered Purchase Order agreement that covered most, but not all, of the additional payments LVC asked for. (Statement Facts, Doc. No. 71 Ex. B). Additionally, LVC has not done any more work on the NAM project since the work done at the Plant.

Guarantee brought suit in Missouri state court against LVC and GM asking for enforcement of its mechanic lien, breach of contract (against LVC only), quantum meruit, and unjust enrichment. (State Court Filing Notice, Doc. No. 1) Guarantee filed this suit after not being paid in full by LVC. (Memo. Opp'n, Doc. No. 73). On May 25, 2005, Defendants removed the case to this Court on the basis of diversity of citizenship. (Removal Notice, Doc. No. 2). After making an unsuccessful demand on LVC to "assume the defenses of, hold harmless, and indemnify GM from all claims" made by Guarantee, GM brought a cross-claim asserting that LVC must defend and indemnify GM for any losses caused by the present suit. (Cross-cl., Doc. No. 17). In its motion for summary judgment, GM argues that the references to GM 1638 in the invitation to bid and in the purchase order incorporated it into the contract; thus, LVC must indemnify GM. LVC claims that GM 1638 never became part of the contract because it was never given a copy of it.

---

[27]GM believed the Plant was accessible, and asserts that provisions of GM 1638 negate the other claims. (Memo. Support, Doc. No. 70). LVC's job log seems to indicate that numerous delays came up during the two weeks of work. (Memo. Opp'n, Doc. No. 73 Ex. H).

[28]It is not entirely clear if LVC actually submitted it because the copy given to the Court is unsigned. GM cites the project change request form as evidence that the Purchase Order constituted the contract and as evidence that LVC was trying to act within that contract.

9

LVC filed a cross-claim against GM. (Second Am. Cross-cl., Doc. 55). Specifically, it claimed that GM breached its contract by a) enlarging the scope of the work; b) compressing the period of time for performance; c) failing to provide LVC with accurate drawings; d) refusing LVC access to the plant; e) altering change orders submitted by LVC; f) interfering with LVC's performance and completion of the work at the Plant; and g) making it commercially impracticable for LVC to complete the job. In its motion for summary judgment, GM asserts that multiple provisions of GM 1638 prevent LVC from proving a breach of contract.

LVC also brought claims for unjust enrichment and quantum meruit, asking for the reasonable value of the work it performed. GM's motion for summary judgment argues that no action for quantum meruit or unjust enrichment can be brought because there is an express contract covering the same subject matter.

LVC also brought claims for fraud and negligent misrepresentation because GM made false representations about the scope of the work, access to the plant, and its intentions to award a blanket contract. In its motion for summary judgment, GM asserts that LVC's claim for fraud and negligent misrepresentation fails because: a) it never made any fraudulent representations; b) any representations related to future events; c) that LVC had the means to learn if the representations were truthful or not; and d) that any oral statements relied upon are excluded by the integration clause in GM 1638.

Finally, LVC claims that GM abandoned the contract by changing the scope of the project so drastically. GM's motion for summary judgment argues that LVC continued to act under the contract.

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I. GM's Motion for Summary Judgment on Its Cross Claim[29]

The application of GM 1638's indemnity provision turns on two issues: (1) whether GM 1638 was incorporated by reference into the contract; and (2) whether LVC ever received a copy of GM

---

[29]The parties have agreed that Michigan law applies to both motions for summary judgment. (Statement Facts, Doc. No. 53 ¶ 18; Response, Doc. No. 66 ¶ 18).

11

1638. GM correctly asserts that a contract can be made up of several documents <u>Phillips v. Grace Hosp.</u>, 580 N.W.2d 1, 3-4 (Mich. Ct. App. 1998) and when one writing references another for additional contract terms, the two writings should be read together. <u>Forge v. Smith</u>, 580 N.W.2d 876, 881 (Mich. 1998). Issues of material fact exist about whether GM 1638 became part of the contract between GM and LVC because the parties have not given the Court sufficient information about the formation of the contract. The Court has to be able to ascertain what documents make up the contract before it can construe the terms therein. For a valid contract to exist, there must offer and acceptance. <u>J & L Inv. Co., L.L.C. v. Dep't of Natural Res.</u>, 593 S.W.2d 196, 200 (Mich. Ct. App. 1999). Here, the Court is not able to identify what was the offer and what was the acceptance. GM asserts that the invitation to bid and the Purchase Order reflect the terms of the contract. Evidence suggests, however, that GM rejected LVC's initial bid. (Doc. No. 75 Ex. 3). Additionally, LVC did not sign the Purchase Order. (Doc. No. 73 Ex. 1).[30] Furthermore, the parties have presented scant evidence outside these two documents that shows when the contract was formed, and on what terms. The Court, therefore, does not have enough factual information to construe the terms of the contract. Thus, genuine issues of material fact remain about what documents, and what terms, make up the contract between LVC and GM.

Even if GM 1638's terms were part of the contract, an additional issue of material fact exists regarding whether GM ever gave LVC a copy of GM 1638. GM is again correct in asserting that one who signs a document is presumed to have read and understood its contents. <u>Clark v. DaimlerChrysler</u>

---

[30]GM makes an additional argument that an indemnity provision on the Purchase Order itself requires LVC to defend it and hold it harmless GM. The Court believes that the absence of a signature by LVC, along with the issues of fact discussed above, preclude a summary judgment based on this argument.

Corp., 706 N.W.2d 471, 475 (Mich. Ct. App. 2005). This rule, however, does not apply when fraud, coercion or mistake is present. Id.; see also DeOrnellas v. Aspen Square Management, Inc., 295 F. Supp. 2d 753, 763 (E.D. Mich. 2003) (quoting 17A Am. Jur. 2d Contracts § 224 (1991) (naming "fraud, misrepresentation, or other wrongful acts," as the exceptions to the presumption of having read a contract). Both sides have come forward with competing evidence about whether LVC ever received the document and whether GM wrongfully withheld the document from LVC. Anon, in his affidavit, states that LVC never received a copy of GM 1638 during the bidding process, that LVC tried for over five months to procure a copy of GM 1638, and that GM intentionally withheld the document from LVC. (Memo. Opp'n, Doc. No. 64, Ex. 1). A second LVC employee, Jane Gerstch, claims in her affidavit the Purchase Order did not contain a copy of GM 1638. (Id. at Ex. 2). GM provided a competing affidavit from an LVC employee who contends that LVC received a copy of GM 1638 in March, 2004 and that numerous employees, including Anon, had a copy of it. (Supplemental Statement Facts, Doc. No. 68, Ex. 1). Neither GM nor LVC has offered any documentary evidence purporting to show either a date of mailing or a date of receipt. It is for the jury to decide which story it finds more credible. Accordingly, GM's Motion for Summary Judgment on Its Cross Claims must be denied.

## II. GM's Motion for Summary Judgment on LVC's Cross Claims

*A. Breach of Contract*

GM asserts that LVC's action for breach of contract is precluded by multiple provisions of GM 1638. As explained previously, there is a genuine issue of material fact about whether or not GM 1638's terms and conditions are part of the contract. GM also argues that statements by LVC's Rule 30(b)(6) representation prove no breach of contract occurred. (Memo. Supp., Doc. No. 70). LVC

asserts that these statements have been taken out of context by GM. (Resp. Supplemental Statement Facts, Doc. No. 94 ¶ 8-9). A jury is best equipped to judge the credibility of LVC's Rule 30(b)(6) designee. GM's Motion for Summary Judgment as to Count I of LVC's Second Amended Cross-Claim must be denied.

*B. Unjust Enrichment and Quantum Meruit*

GM argues GM 1638 preclude's LVC from recovering for unjust enrichment and quantum meruit because it is an express contract which covers the same subject matter as LVC equitable claims. Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. Ct. App. 1993) (holding claims for unjust enrichment and quantum meruit are precluded where an express contract covers the same subject matter). As previously explained, issues of fact remain about what the exact terms of the contract are and whether GM 1638 applied to the contract.[31] Although LVC can only recover in quantum meruit for services performed outside the contract, it is for the trier of fact to determine what the scope and terms of the express contract are and to see if any services were performed outside of the contract. See Keywell & Rosenfeld v. Bithell, 657 N.W.2d 759, 776 (Mich. Ct. App. 2002) (jury to decide between existence of express contract, scope of express contract, and availability of quantum meruit); H.J. Tucker & Assocs. v. Allied Chucker & Eng'g Co., 595 N.W.2d 176, 188 (Mich. Ct. App. 1999) (discussing how plaintiff could recover for breach of contract for period while contract was in force

---

[31]GM additionally asserts that regardless of the application of GM 1638, the Purchase Order and Alteration No. 1 make up the express contract between the parties because LVC has admitted this fact in its Answer; thus, an action for equitable relief cannot go forward.(see footnote 15 for text of pleadings). GM is correct that "even if post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions." Missouri Hous. Dev. Comm'n v. Brice, 919 F.2d 1306 (8th Cir. 1990). LVC only admitted that there was a contract at some point; it did not admit that an express contract covered all the work done at the Plant.

and could recover under quantum meruit for the period when contract was not in force); Thus, GM's Motion for Summary Judgment as to Count II and III of LVC's Second Amended Cross-Claim must be denied.

*C. Fraud and Negligent Misrepresentation*

LVC claims that GM committed fraud and negligent misrepresentation in its representations about the scope of the work and the time to complete it, the access to the Plant, and its intentions to award a blanket contract. GM asserts that these claims fail because none of its representations were fraudulent, all representations related to future events, LVC had the means to learn the truth of the representations, and GM 1638 prevented LVC from relying on oral statements made by GM.

Viewing the evidence in the light most favorable to LVC, issues of material fact exist regarding whether GM misrepresented the awarding of the blanket contract, the scope of the work and the time needed to do it, or the access of LVC to the plant. GM is correct that actions for fraud and negligent misrepresentation cannot be based on statements of future promises and must relate to past or existing facts. Forge v. Smith, 580 N.W.2d 876, 883-84 (Mich. 1998) (applying this rule to negligent misrepresentation); Hi-Way Motor Co. v. Int'l Harvestor Co., 247 N.W.2d 813, 816 (Mich. 1976) (applying this rule to fraud). LVC, however, has come forward with evidence that relates to alleged misrepresentations of existing facts. Specifically, LVC has come forward with a list of twenty four sites that was attached to the original invitation to bid. (Response, Doc. No. 73 Ex. K). This list contains an existing fact (the GM plants to be awarded in the bid); thus LVC's fraud and negligent misrepresentation claims cannot be barred because LVC has come forward with some evidence of the alleged misrepresentations of existing facts.

Genuine issues of fact also remain on LVC's other allegations of misrepresentation. LVC has

15

come forward with the affidavit of Richard Shaffer to support its contention that GM misrepresented the scope of the work to be done at the Plant. (Memo. Opp'n, Doc. No. 73 Aff. 2 ¶ 17-21). LVC and GM have also presented conflicting evidence as to why LVC only had access to the Plant for one afternoon. (Compare Doc. No. 70 Ex. K at pg. 117 (asserting LVC never asked for access) with Doc. No. 73 Aff. 2 (stating LVC asked for access and was denied)). A jury should decide which evidence it finds credible. Finally, a genuine issues of material fact exist regarding GM 1638 and its effect on these claims. GM's Motion for Summary Judgment as to Count IV and V of LVC's Second Amended Cross-Claim must be denied.

### E. Abandonment

Under Michigan law, the abandonment of a contract "is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted." Dault v. Schulte, 187 N.W.2d 914, 915 (Mich. Ct. App. 1971). Again, summary judgment is not proper on this issue. Whether GM 1638 applied (and controlled the process of payment for additional work) is genuine issue of material fact. Additionally, LVC has come forward with evidence that GM's actions fall outside the unit pricing basis contemplated by the initial bidding because they requested additional work done on a time and money basis, whereas GM has come forward with evidence that LVC continued to operate within the contract. (Compare LVC's Response, Doc. No. 73 Ex. H with GM's Memo. in Support, Doc. No. 70 Ex. B, K). It is for the trier of fact to decide which evidence it finds more credible. See Dault, 187 N.W.2d at 915.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant/ Cross Plaintiff General Motors Corporation's

Motion for Summary Judgment (Doc. No. 51) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant/ Cross Plaintiff General Motors Corporation's Motion for Summary Judgment (Doc. No. 69) on is **DENIED**.

Dated this 29th day of September, 2006.

/s/ Jean C. Hamilton

UNITED STATES DISTRICT JUDGE
